UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard Edward ANDREWS,
Defendant-Appellant.

No. 84–1543
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Oct. 30, 1984.

David R. Snodgrass (Court-appointed),
Philip J. Nicholsen, Dallas, Tex., for de-
fendant-appellant.

James A. Rolfe, U.S. Atty., Fort Worth,
Tex., Christopher Lee Milner, Asst. U.S.
Atty., Dallas, Tex., for plaintiff-appellee.

Before GEE, JOHNSON, and DAVIS,
Circuit Judges.

JOHNSON, Circuit Judge:

Appellant-defendant Richard Edward An-
drews was convicted on a single count of
possession of a firearm affecting interstate
commerce by a convicted felon. 18 U.S.C.
App. § 1202(a)(1). Andrews appeals, con-
tending that the district court improperly
denied his motion to suppress the admis-
sion of the weapon on which his indictment
was based. Andrews contends that the
district court erred in that the weapon was
obtained by law enforcement officers
through fraud, trickery, and deception.
After careful consideration of Andrews'
claim, we affirm.

I. THE FACTS

On July 23, 1983, Federal Agent William
Daniel Dwight detained and questioned An-
drews during the execution of a search
warrant for a motel room in Duncanville,
Texas. Andrews was named in the search
warrant. Dwight, who was accompanied
by state and federal agents, found An-
drews waiting for someone across the hall
from the motel room. Dwight handcuffed
Andrews and led him into the motel room.

Agent Dwight then advised Andrews that he was not under arrest; he was handcuffed as a precautionary measure for carrying out the search. Agent Dwight also read Andrews his *Miranda* rights and asked Andrews if he would mind talking to him. Andrews apparently consented. When the officers found a gun in the room, Andrews was asked if the gun was his. Andrews answered that it was not, but then stated that he owned two guns, which were in his home in Corsicana, Texas. Andrews described one of these guns as being a sawed-off shotgun.[1] Dwight asked Andrews if the sawed-off shotgun was of legal length. When Andrews said that it was, Dwight asked Andrews if he would mind if he, Agent Dwight, examined the shotgun personally. Andrews said that he would not mind.

Dwight's purpose in asking to inspect the shotguns was to establish Dwight's possession of firearms so that Andrews could be charged with the crime of illegal possession of a firearm by a felon. Dwight did not, however, tell Andrews this purpose. Rather, Dwight told Andrews that a person fitting Andrews' description had been connected to various robberies in which a sawed-off shotgun was employed. Although Dwight did not testify to this, Andrews did, and the district court specifically found that Andrews truthfully stated Dwight's expressed reasons for requesting the inspection. After the search of the motel room was concluded, Andrews was unhandcuffed, told that he was not under arrest, and permitted to drive the fifty miles to Corsicana in his own vehicle. The officers followed Andrews in a separate vehicle. Upon arrival, Andrews led the officers to his residence and produced two shotguns for Dwight to examine. Agent Dwight then seized the weapons.

Andrews was later indicted. At the suppression hearing, Andrews testified that his purpose in producing the shotguns was to clear himself of the robberies. He also stated that he would not have exhibited the guns had he known Dwight's unexpressed motive in having the gun produced. The district judge found that Andrews' consent in permitting the search was voluntary and denied the motion to suppress. Andrews later pleaded guilty to the charge but preserved the denial of the motion to suppress for review by this Court on appeal.

## II. MOTION TO SUPPRESS

Andrews contends that the weapon upon which his conviction is based was obtained through fraud, trickery and deceit and should therefore be inadmissible as evidence in a criminal prosecution. While Andrews' claim has substantial merit, it must be rejected under the circumstances of the case at bar.

Andrews relies on *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921).[2] *Gouled*, however, is readily distinguishable from the instant case. In *Gouled*, someone obtained entry into a suspect's home by falsely representing that he intended only to pay a social visit. When the suspect left the room, the intruder ransacked the suspect's private papers and seized some of them. The Supreme Court held that the Fourth Amendment had been violated. Here, however, the suspect knew that he was dealing with a government agent and that the agent was pursuing a criminal investigation. *See United States v. Enstam*, 622 F.2d 857, 868 (5th Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336, 451 U.S. 907, 101 S.Ct. 1974, 68 L.Ed.2d 294 (1981).

 While it is well-settled that a search conducted without a warrant is generally unreasonable, it is equally well-set-

---

1. It is not clear from the record how much of this information was volunteered by Andrews and how much was in direct response to Dwight's questioning. Dwight and Andrews were the only witnesses at the suppression hearing, and their testimony conflicted. *See* Rec. Vol. II at 24, 33–34.

2. Andrews' counsel cites one other case, *People v. Parisi*, 42 Misc.2d 607, 249 N.Y.S.2d 493 (1964). *Parisi* suffers from many of the problems of *Gouled*, noted in the text.

tled that one of the specifically established exceptions to this rule is that a search will be valid if it is conducted pursuant to the defendant's consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). That consent must be voluntary. *Id.* at 233, 93 S.Ct. at 2050. In determining whether consent is voluntary, the Supreme Court has directed, "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Id. See also United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The Government bears the burden of proving such consent by clear and convincing evidence. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *United States v. Parker*, 722 F.2d 179, 182 (5th Cir.1983). This Court, however, has noted that the trial court's determination "that the prosecutor has met his burden of showing that a defendant's consent was freely and voluntarily given" cannot be overturned unless the district court was "clearly erroneous." *United States v. Jones*, 475 F.2d 723, 728 (5th Cir.), *cert. denied*, 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973); *United States v. Phillips*, 664 F.2d 971, 1023 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, 459 U.S. 906, 103 S.Ct. 208,

74 L.Ed.2d 166 (1982). The question at issue is whether the defendant's will was overborne. *Jones*, 475 F.2d at 730.

Applying the *Schneckloth* test, Andrews' contention must be rejected, even assuming, as he alleges, that Agent Dwight intended to trick him into producing the guns for inspection.[3] In *United States v. Phillips*, this Court noted that a variety of factors influences this determination, including "[the] voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found." *Id.* at 1023–24. Here, Andrews was neither under arrest when he initially consented to produce the shotgun nor later when he actually produced it. He was told at the end of the search that he was free to go. Andrews had been advised of his *Miranda* warnings and had voluntarily waived them. Andrews has a high school diploma. He made no claim of intimidation or other threats of force or coercion. In response to questions from the court, Andrews stated that Dwight had not forced him in any way to produce the shotgun. Andrews obviously felt that no incriminating evidence would be found, which, as *Phillips* directs, points to the validity of the consent. Final-

---

**3.** Contrary to the implication of Andrews' brief, the trial court did not find that Dwight *mis*represented his intentions to Andrews. Rather, the district court stated, "I have no reason to disbelieve what Mr. Andrews has told me in that respect." Record Vol. II at 42. Andrews, however, testified only that the representations were made to him, not that they were made falsely. It is consistent with the record that Dwight may have had two purposes in wishing to see the guns and only expressed the more serious. Indeed, the only direct evidence on the matter is Dwight's own statement that he made no fraudulent representation to Andrews. *Id.* at 19–20. In the event that Dwight had no fraudulent intent, we would have no hesitancy in affirming the conviction; a mere failure to state a purpose does not render defendant's consent involuntary. *See* 2 W. LaFave, Search and Seizure § 8.2, at 687 (1978). *Cf. SEC v. ESM Govern-*

*ment Securities, Inc.*, 645 F.2d 310 (5th Cir.1981) (remand necessary to determine whether SEC agent intentionally misled defendant).

Still, however, the district court could have found from the evidence that Dwight did trick Andrews since Dwight denied expressing any purpose to Andrews in seeing the guns. While this Court might remand to the district court for such a determination, *see ESM Government Securities*, our review of the record, coupled with the district court's oral finding that Dwight's failure to state his purpose in examining the gun did not render Andrews' consent involuntary, convinces us that remand is unnecessary. The consent given here by Andrews was voluntary, even assuming such trickery. *See infra* at 5–6. This negates any need for such a remand. Moreover, the Government's argument concedes, for the purpose of argument, that the representations were misleading.

ly, two hours passed between Andrews' initial consent and the actual production of the guns. During the second hour, Andrews was alone in his own personal vehicle, driving from Duncanville to Corsicana, Texas.

Certainly, any misrepresentation by the Government is a factor to be considered in evaluating the circumstances. *United States v. Briley*, 726 F.2d 1301, 1304 (8th Cir.1984).[4] *See United States v. Juarez*, 573 F.2d 267, 273 (5th Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *United States v. Jones*, 475 F.2d at 730 & n. 5. However, what seems lacking here is any evidence that Andrews' will was overborne.[5] While one might be quite willing to assume that Andrews understandably was anxious to clear his name of any robbery charge (real or imagined), Andrews' production of the gun seems less due to police coercion or trickery than it does to his own lack of knowledge that his possession was unlawful [6] or his unfounded hope that Dwight would overlook the infraction. Throughout the interrogation, Andrews showed no hesitancy in answering police questions or in otherwise cooperating with the police.

We recognize that cases prior to *Schneckloth* strongly suggest that consent obtained through police trickery is involuntary. *See, e.g., Alexander v. United States*, 390 F.2d 101 (5th Cir.1968); *Graves v. Beto*, 424 F.2d 524 (5th Cir.), *cert. denied*, 400 U.S. 960, 91 S.Ct. 353, 27 L.Ed.2d 269 (1970). While these cases have been undermined to some degree by the Supreme Court decision in *Schneckloth, see* W. LaFave, Search and Seizure § 8.2, at 687–88 (1978), we feel, in any event, the cases are distinguishable. *Alexander* involved an illegal arrest, while Andrews (in the instant case) was not even under arrest and, indeed, had an hour in his own vehicle to reconsider his consent. *Graves* involved a defendant who initially refused to give a blood sample but later consented when he was told it would be used only to determine alcohol content. The Court refused to allow the blood sample to be used later to establish identity. Here, there is no evidence indicating that Andrews was assured his production of the guns would *only* be used to investigate the robberies. *See* 424 F.2d at 525.

Likewise, this Court and others have held that the Fourth Amendment is violated where an administrative officer represents

4. For instance, we might note, without deciding, that evidence which showed that defendant was frightened due to the misrepresentation or was promised that he could go free if he exonerated himself from the expressed crime would weigh heavily in favor of granting the motion to suppress.

5. The Third Circuit has encountered a situation similar to the instant case. In the Third Circuit case, a defendant, who had been warned of his rights and who knew police were investigating unsolved murders, turned his gun over to a policeman, who suggested to the defendant that he (the policeman) could sell the gun for the defendant. The policeman then turned the gun over to ballistics experts. The court held that the defendant had waived voluntarily his Fourth Amendment rights, despite the policeman's deception in obtaining the gun. *Brown v. Brierley*, 438 F.2d 954 (3d Cir.1971). For the court, Judge Adams noted, "Whether an attempt to lead the police astray in their investigation, or the act of a gullible and inept criminal, Brown's uncoerced relinquishment of the gun did not constitute an unreasonable search and seizure." *Id.* at 957–58.

Andrews seemed hesitant in stating even that he would not have consented had he known it was unlawful for him to possess the firearms. At the suppression hearing he stated:
Q: Mr. Andrews, if Mr. Dwight had said, Mr. Andrews, it's against the law for a felon to own or possess shotguns, and I would like to see your shotguns to see if you have been breaking the law, would you then have consented to him coming to your place and looking at the shotguns?
A: Well, I probably wouldn't.
Q: Say that again?
A: I don't imagine I would; no, sir.
Record Vol. II at 36.

6. Moreover, Andrews' ignorance of the firearm statute would not render his consent involuntary, although it might be a factor to consider in the totality of the circumstances. *Cf. Schneckloth*, 412 U.S. at 234, 249, 93 S.Ct. at 2051, 2059 (knowledge of right to refuse is not required to show voluntariness but lack of such knowledge may be considered as relevant circumstance).

falsely that the evidence obtained will be used only in a civil investigation. *See, e.g., United States v. Tweel,* 550 F.2d 297 (5th Cir.1977); *United States v. Goss,* 650 F.2d 1336, 1348 (5th Cir.1981). *See also United States v. Wuagneux,* 683 F.2d 1343 (11th Cir.1982), *cert. denied,* — U.S. —, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). These cases are also distinguishable. The instant case involves a defendant dealing with one he knows to be a criminal investigator conducting a criminal investigation.

Our decision is a narrow one. We hold under the facts of this case, that the government carried its burden in establishing that any taint which may have occurred through any misrepresentation by Dwight does not rise to the level sufficient to overturn this conviction.

The decision of the district court denying the motion to suppress is

AFFIRMED.